# EXHIBIT 1

QUARLES & BRADY LLP
Firm State Bar No. 00443100
Renaissance One
Two North Central Avenue
Phoenix, AZ  85004-2391, 602.229.5200
Edward Salanga (AZ No. 020654)
Edward.Salanga@quarles.com
Brian A. Howie (AZ No. 026021)
Brian.Howie@quarles.com
Lauren E. Stine (AZ No. 025086)
Lauren.Stine@quarles.com
Anthony Pusateri (AZ No. 036206)
Anthony.Pusateri@quarles.com

QUARLES & BRADY LLP
411 East Wisconsin Avenue, Suite 2400
Milwaukee, WI 53202-4426
Telephone:  414.277.3073
Lindsey W. Davis (WI No. 1089654)
(*pro hac vice forthcoming*)
Lindsey.Davis@quarles.com

*Attorneys for Defendant*
*Maricopa County Community College District*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Emily Thoms and Kamaleilani Moreno,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>Maricopa County Community College District,<br><br>                    Defendant. | Case No. 2:21-cv-10781-SPL<br><br>**[*DEFENDANTS' PROPOSED*] FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR PRELIMINARY INJUNCTION HEARING**<br><br>(Assigned to the Hon. Steven P. Logan)<br><br>**(Preliminary Injunction Hearing Set for November 1, 2021, at 9:00 a.m.)** |

Pursuant to the Court's Order dated October 26, 2021 (Dkt. 15), Defendant Maricopa County Community College ("MCCCD") submits its Proposed Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

**I.    The Parties.**

1.    MCCCD is a community college district with ten colleges located in Maricopa County, Arizona. (Dkt. 17-1, p. 4, ¶ 6.)

2.    Emily Thoms ("Thoms") and Kamaleilani Moreno ("Moreno") are enrolled in the nursing program at Mesa Community College. (Compl. ¶ 9.)

**II.    The MaricopaNursing Program and Clinical Rotations.**

**A.    MaricopaNursing.**

3.    Eight MCCCD colleges offer nursing programs, called MaricopaNursing, through which students earn an associate degree in applied science ("AAS"). (Dkt. 17-1, p. 4 at ¶ 7.)

4.    MaricopaNursing is approved by the Arizona State Board of Nursing ("AZBN") and accredited by the Accreditation Commission of Education in Nursing ("ACEN"). (Dkt. 17-1, p. 4 at ¶ 7.)

5.    MaricopaNursing currently has more than 2,200 students. (Dkt. 17-1, p. 4 at

6.    ¶ 7.)

**B.    Clinical Rotations.**

7.    The AZBN is responsible for the licensure of nurses, training, and education programs. See A.R.S. § 32-1606(B).

8.    Pursuant to AZBN regulations, accredited nursing schools are required to offer supervised clinical experience. See A.A.C. R-4-19-206; (Dkt. 17-1, p.4 at ¶ 8.)

9.    MaricopaNursing students must complete four Nursing Theory and Science courses, each of which include clinical rotations during which students treat real-life

1   patients at a pre-approved clinical partner. (Dkt. 17-1, p. 4 at ¶ 9.)

2      10.   The MaricopaNursing administration firmly believes that clinical experiences

3   provide students with necessary, irreplaceable skills. (Dkt. 17-1, p. 4 at ¶ 10.)

4      **C.   MCCCD Clinical Partners.**

5      11.   There are a limited number of healthcare entities in Maricopa County that

6   offer nursing student clinical rotations that satisfy MCCCD's pedagogical requirements and

7   offer appropriate experience and supervision. (Dkt. 17-1, p. 63 at ¶ 7.)

8      12.   MCCCD is not the only educational institution seeking to place nursing

9   students at these facilities, and the various institutions compete for the same clinical rotation

10   opportunities. (Dkt. 17-1, p. 63 at ¶ 7.)

11      13.   These limitations have been exacerbated by the COVID-19 pandemic. (Dkt.

12   17-1 p. 63 at ¶ 7.)

13      14.   For the fall 2021 semester, MCCCD had only 536 clinical rotation spots for

14   its nursing students across its eight colleges (a 15% reduction in clinical rotations from prior

15   years). (Dkt. 17-1, p. 64 at ¶ 13.)

16      15.   These clinical rotations were obtained from 25 different Clinical Partners

17   across 36 different sites/campuses. (Dkt. 17-1, p. 64 at ¶ 13.)

18      16.   This represents a 39% reduction in participating facilities compared to before

19   the COVID-19 pandemic. (Dkt. 17-1, p. 64 at ¶ 13.)

20      **D.   Clinical Partner Agreements.**

21      17.   MCCCD enters into written agreements ("Clinical Partner Agreements") with

22   its clinical partners ("Clinical Partners"), pursuant to which Clinical Partners make a limited

23   number of clinical rotation spaces available to MCCCD students each semester. (Dkt. 17-

24   1, p. 63 at ¶ 8.)

25      18.   As part of the Clinical Partner Agreements, MCCCD generally agrees that its

26   students will "adhere to the existing rules and regulations" set by Clinical Partners. (Dkt.

-3-

17-1, pp. 63-64 at ¶¶ 9, 11, p. 71.)

19.     MCCCD does not (and cannot) set the rules of its Clinical Partners (Dkt. 17-1, p. 64 at ¶ 10.)

20.     MCCCD does not (and cannot) control the clinical environments of its Clinical Partners. (Dkt. 17-1, p. 64 at ¶ 10.)

**E.     Most Stringent Clinical Partner Requirements.**

21.     For at least 15 years, MaricopaNursing students have had to agree in advance that they will meet the placement requirements as set up by MCCCD's "most stringent clinical partner." (Dkt. 17-1, p. 5 at ¶ 11.)

22.     MaricopaNursing students agree to meet the requirements of MCCCD's most stringent Clinical Partner to ensure that MCCCD may engage in random student placement with Clinical Partners. (Dkt. 17-1, p. 5 at ¶ 11.)

23.     This requirement ensures that students comply with applicable safety procedures (e.g., immunizations) regardless of the Clinical Partner site assignment. (Dkt. 17-1, p. 5 at ¶¶ 11-12.)

24.     The safety procedures to which students must comply are dictated by MCCCD's Clinical Partners, not MCCCD itself. (Dkt. 17-1, p. 5 at ¶ 12.)

**F.     Clinical Partner Assignments.**

25.     MCCCD and its Clinical Partners work months in advance of each semester to determine the number of clinical rotation spots available based on the learning needs of the students for the semester. (Dkt. 17-1, p. 5 at ¶ 13.)

26.     MCCCD then allocates those spots among its eight nursing colleges, which then allocate those spots to eligible students at each of the colleges. (Dkt. 17-1, p. 5 at ¶¶ 13-14.)

27.     Each of MCCCD's eight nursing colleges is individually responsible for the assignment of students within its own program, and the assignments are done with the

assistance of each college's faculty that teach the Nursing Theory and Science courses with in-person clinical rotation requirements. (Dkt. 17-1, p.5 at ¶ 14.)

28. MCCCD does not match students with their preferred Clinical Partner or have a policy that allows students to "rank their top three" choices, as MCCCD does not have the resources to engage in such a customized process. (Dkt. 17-1, pp. 5-6 at ¶ 15.)

29. Instead, MCCCD follows a random student assignment process for Clinical partner placements. (Dkt. 17-1, p. 6 at ¶ 15.)

30. To ensure adequate supervision, only a limited number of students may participate in clinicals per day and per Clinical Partner site. (Dkt. 17-1, p. 6 at ¶ 16.)

31. Clinical rotations are therefore staggered during the semester, and students may be assigned to multiple Clinical Partner sites each semester to complete rotations. (Dkt. 17-1, p. 6 at ¶ 16.)

**III.    Clinical Partners Stop In-Person Clinical Rotations in 2020.**

32. Due to significant safety risks and lack of staffing in the wake of the COVID-19 pandemic, MCCCD's Clinical Partners stopped hosting in-person clinical rotations in spring 2020. (Dkt. 17-1, p. 6 at ¶ 17.)

33. On March 20, 2020, however, the AZBN adopted a "Temporary Waiver of Applicable Professional Licensure Requirements" ("Temporary Waiver"), which allowed educational institutions to apply for a waiver to "substitute direct patient care clinical/instruction with simulations during the State of Emergency." (Dkt. 17-1, p. 6 at ¶ 18, pp. 18-20.)

34. MCCCD obtained a Temporary Waiver from AZBN to offer simulated clinical experiences during this time period, so that its nursing students could continue and complete their semesters and/or programs. (Dkt. 17-1, p. 6 at ¶ 19.)

35. A waiver was necessary because AZBN normally requires in-person clinical rotations. (Dkt. 17-1, p. 6 at ¶ 18, pp. 18-20.)

36.     Under this Temporary Waiver, all students enrolled in a Nursing Theory and Science course participated in simulated clinicals designed to imitate, to the extent possible, the type of in-person activities offered during rotations with a Clinical Partner. (Dkt. 17-1, pp. 6-7 at ¶ 20.)

37.     MCCCD never intended these simulated experiences to be a permanent alternative to in-person clinicals. (Dkt. 17-1, pp. 6-7 at ¶ 20.)

38.     MaricopaNursing administrators and faculty firmly believe that in-person experiences are vital to the integrity of the program, the preparation of students for practice, and the care and safety of patients. (Dkt. 17-1, p. 7 at ¶ 21.)

39.     This belief is supported by the statements of MCCCD's Clinical Partners, who have indicated that students with a greater percentage of simulated clinical hours lack communication and hands-on skills as compared to other students with in-person clinical hours. (Dkt. 17-1, p. 7 at ¶ 21.)

**IV.     Clinical Partners Resume Certain Clinical Rotations.**

40.     By spring 2021, most of MCCCD's Clinical Partners had resumed in-person clinical rotations for nursing students for certain surgical and critical care areas, and MCCCD therefore stopped offering simulated clinicals for those skills sets. (Dkt. 17-1, p. 7 at ¶ 22.)

41.     However, most Clinical Partners still do not permit in-person rotations in certain specialty areas (e.g., pediatrics). (Dkt. 17-1, p. 7 at ¶ 23.)

42.     In the absence of such opportunities, MCCCD continues to offer simulated experiences for those specialties only. (Dkt. 17-1, p. 7 at ¶ 23.)

**V.     Clinical Partners Institute COVID-19 Vaccination Requirements.**

43.     In late August 2021—after MCCCD already had made its clinical assignments for the fall 2021 semester—many Clinical Partners notified MCCCD that students attending clinical rotations at their facilities would be required to provide proof of

-6-

1  COVID-19 vaccination. (Dkt. 17-1, p. 9 at ¶ 31, p. 64 at ¶ 14.)

2      44.     Some Clinical Partners would consider medical or religious exemptions from

3  the vaccination requirement, while others made clear that they would not. (Dkt. 17-1, p. 64

4  at ¶ 14.)

5      45.     For instance, on July 22, 2021, Banner Health informed MaricopaNursing that

6  all nursing students attending in-person clinical rotations would need to provide proof of

7  COVID-19 vaccination and could apply for religious accommodations. (Dkt. 17-1, p. 10 at

8  ¶ 32, pp. 31-33)

9      46.     On September 16, 2021, Mayo Clinic informed MaricopaNursing of a similar

10  vaccination requirement, but Mayo would not allow accommodations. (Dkt. 17-1, p. 10 at

11  ¶ 33; pp. 35-36.)

12      47.     Some Clinical Partners have modified their vaccine or exemption

13  requirements, which has resulted in a constantly changing landscape. (Dkt. 17-1, pp. 7–8 at

14  ¶¶ 26–27.)

15      48.     In September 2021, there were 50,993 COVID-19 cases in Maricopa County,

16  which resulted in 4,091 hospitalizations and 1,209 deaths.  (See COVID-19 Cases by Day,

17  Ariz. Dep't of Health Servs., https://www.azdhs.gov/covid19/data/index.php#confirmed-by-day

18  (last updated Oct. 26, 2021); Hospitalization, Ariz. Dep't of Health Servs., https://

19  www.azdhs.gov/covid19/data/index.php#hospitalization (last updated Oct. 26, 2021); COVID-

20  19 Deaths, Ariz. Dep't of Health Servs., https://www.azdhs.gov/covid19/data/index.php#deaths

21  (last updated Oct. 26, 2021)).

22      49.     As of October 25, 2021, approximately 37 of MCCCD's Clinical Partners

23  have implemented some form of a COVID-19 vaccination requirement. (Dkt. 17-1, pp. 8-9

24  at ¶ 27.)

25

26

**VI.**   **Compliance with Clinical Partner Vaccine Requirements.**

50.     In August 2021, MCCCD informed its nursing students of its Clinical Partner vaccine requirements and advised that, to ensure compliance with the Clinical Partners' rules, students would be required, by September 30, 2021, to (1) provide proof they had received the Pfizer or Moderna two-dose vaccination, (2) provide proof they had received the Johnson & Johnson one-dose vaccination, or (3) complete and upload a signed form indicating they were declining the COVID-19 vaccine. (Dkt. 17-1, p. 9 at ¶¶ 28–29, pp.22-24.)

51.     MCCCD informed students that if they declined the vaccine, it may result in their removal from the clinical rotation component of the applicable course, and a possible incomplete, withdrawal from, or failure of the clinical aspect of the applicable course. (Dkt. 17-1, p. 9 at ¶ 30, pp. 26-29.)

52.     MCCCD reminded students that it "cannot alter any clinical partner requirements" but encouraged students to seek accommodations directly from the Clinical Partner, if applicable. (Dkt. 17-1, p. 9 at ¶ 30, pp. 26-29.) (emphasis added.)

53.     MCCCD cannot alter Clinical Partners' vaccine requirements for clinical rotations, nor can MCCCD force a Clinical Partner to allow a student that is not COVID-19 vaccinated to participate in in-person clinical rotations at the Clinical Partner's site. (Dkt. 17-1, p.10 at ¶ 34.)

54.     MCCCD can, and has, offered academic accommodations to nursing students on religious or other grounds and has established a process by which students can seek academic accommodation from Clinical Partner requirements. (Dkt. 17-1, p. 10 at ¶ 34.)

55.     For example, for students assigned to Clinical Partners that do not require vaccination or permit exemptions, MCCCD has not deemed those students out of compliance with MCCCD's long-standing "comply with the most stringent Clinical Partner" requirement. (Dkt. 17-1, p. 10 at ¶ 35.)

QB\70863945.1

56.   Likewise, for students assigned to Clinical Partners that do not offer any exemptions, MCCCD has waived its tuition refund and withdrawal policy, allowed students to complete the classroom aspects of their clinical courses, and allowed students to take an incomplete for the course and make up the clinical rotation component of the course next semester (assuming adequate placements are available). (Dkt. 17-1, pp. 10-11 at ¶ 36.)

57.   MCCCD has granted these academic accommodations to all 124 students seeking religious accommodation. (Dkt. 17-1, p. 11 at ¶ 37.)

**VII.   <u>Plaintiffs Are Randomly Assigned to Clinical Partners</u>.**

58.   In August 2021, MCCCD finalized its fall 2021 Clinical Partner placement sites for nursing students. (Dkt. 17-1, p. 9 at ¶ 31.)

59.   Without advance knowledge of Plaintiffs' religious beliefs or the requirements of the Clinical Partners' where they were placed, Thoms was randomly assigned to rotations at Banner Heart and Mayo Clinic, commencing on October 18 and November 8, 2021, respectively. (Dkt. 17-1, p. 9 at ¶ 31.)

60.   Without advance knowledge of Plaintiffs' religious beliefs or the requirements of the Clinical Partners' where they were placed, Moreno was randomly assigned to Mountain Vista Medical Center and Mayo Clinic, commencing on October 5 and November 18, 2021, respectively. (Dkt. 17-1, p. 9 at ¶ 31.)

61.   As noted, Mayo does not allow for religious exemptions.  On September 10, 2021, Plaintiffs submitted virtually identical "declination" and "accommodation" forms identifying religious objections to vaccinations and seeking accommodation. (Dkt. 17-1, p. 11 at ¶¶ 38–39; pp. 42-53.)

62.   On September 14, 2021, MCCCD informed Plaintiffs that it could not alter the requirements of their Clinical Partners, but it could offer them the academic accommodations described in Paragraph VI.7 above. (Dkt. 17-1, p.11 at ¶ 40, pp. 54-59; Dkt. 1, ¶¶ 54, 61.)

-9-

**VIII.  Plaintiffs Demand Accommodations That Are Not Feasible.**

63.     In response, Plaintiffs insisted on alternate accommodations, including that MCCCD: (1) alter its contracts and negotiate with Clinical Partners to permit religious exemptions for Plaintiffs during their fall 2021 rotations, (2) allow Plaintiffs to complete their clinicals via simulation or extra assignments during fall 2021, (3) allow Plaintiffs to complete their clinicals at "fire departments or physicians' offices" during fall 2021, or (4) switch Plaintiffs to a Clinical Partner site that does not mandate vaccination or permits exemptions during fall 2021. (See Dkt. 1, ¶ 30; Dkt. 17-1, p.11 at ¶ 41.)

64.     MCCCD evaluated these each of these requests and determined they were not feasible, reasonable, or both. (Dkt. 17-1, p.11 at ¶ 42.)

65.     MaricopaNursing has determined that it would need to make any accommodation given to Plaintiffs available to other similarly situated MaricopaNursing students whose religious beliefs are inconsistent with their assigned Clinical Partner's vaccination requirements, and there are approximately 30 MaricopaNursing students who fall within this category. (Dkt. 17-1, p. 14 at ¶ 52.)

**A.     Modify Clinical Partner Agreements.**

66.     Clinical Partners have the ultimate authority to determine the rules and regulations applicable to the clinical setting. (Dkt. 17-1, p. 65 at ¶ 16.)

67.     MCCCD has engaged in ongoing dialogue with its nursing Clinical Partners regarding their COVID-19 vaccination requirements, and some Clinical Partners have implemented student exemption processes that did not exist at the start of the semester. (Dkt. 17-1, p. 65 at ¶ 16.)

68.     Other Clinical Partners (e.g. Mayo Clinic) have not implemented student exemption processes. (Dkt. 17-1, p. 65 at ¶ 16.)

69.     Clinical Partners are in a better position to determine what is appropriate for their facilities and patient populations, particularly as it related to COVID-19 health and

QB\70863945.1

safety protocols, and MCCCD cannot force its partners to alter their rules. ((Dkt. 17-1, p. 65 at ¶ 17.)

**B.      Simulation or Extra Assignments.**

70.     MCCCD has determined that neither simulation nor extra assignments are an adequate substitute for hands-on clinical experience; that approach would lower or substantially modify essential requirements of the nursing program at a time when suitable in-person options are available. (Dkt. 17-1, p. 12 at ¶ 44.)

71.     On September 27, 2021, the National Council of State Boards of Nursing (NCSBN) issued a policy brief to guide nursing education programs receiving requests from students for alternative clinical experiences when a program's clinical partners require COVID-19 vaccination in which it noted that nursing education programs "are not obligated" to provide alternate clinical experiences based on a student's request and stated, "care experiences with actual individuals or groups continue to be the most important component of clinical education." (Policy Brief: Clinical Experiences for Unvaccinated Nursing                              Students,                              NCSBN, https://www.ncsbn.org/PolicyBriefUnvaccinatedNursingStudents.pdf.)

72.     MCCCD also has determined that simulation would be financially and logistically unviable, as simulation lab space and personnel are committed through the remainder of the fall semester. (Dkt. 17-1, p. 13 at ¶ 45.)

73.     Offering simulation for select students would require MCCCD to secure and pay additional staff—mid-semester, on extremely short notice, and in the midst of a nursing faculty shortage—to supervise the unanticipated simulated clinical sessions. (Dkt. 17-1, p. 13 at ¶ 45.)

74.     MCCCD is unable to rely on existing adjunct or residential faculty as a majority of those staff members already have full schedules for the remainder of the fall semester. (Dkt. 17-1, p. 13 at ¶ 45.)

75.     Ancillary personnel would also be required to schedule, prepare, and facilitate these simulations. (Dkt. 17-1, p. 13 at ¶ 45.)

76.     Securing physical space and participants for a simulation program would require months of planning, as it is likely that Plaintiffs are not the only students who were assigned to sites with vaccination policies inconsistent with their beliefs. The process would require coordination among MCCCD's eight colleges to secure space to perform the simulations, hire faculty, and develop custom curricula and scenarios for each of the required simulations programs—all with sufficient time to allow for actual participation in the simulation prior to the end of the fall semester. (Dkt. 17-1, p. 13 at ¶ 46.)

**C.     Clinicals at Unapproved Locations.**

77.     MCCCD has determined that it is not appropriate or feasible for Plaintiffs to complete clinicals at unapproved local fire departments or physicians' offices that do not mandate the vaccine. (Dkt. 17-1, p. 14 at ¶ 47.)

78.     MCCCD must ensure clinical sites offer experience in the relevant competencies, with suitable supervision and hands-on practice. (Dkt. 17-1, p. 14 at ¶ 47.)

79.     MCCCD would also need to enter into a Clinical Partnership Agreement with each such site. It is not feasible to accomplish these tasks within the Plaintiffs' desired timeframe (i.e., before the end of the fall 2021 semester). (Dkt. 17-1, p. 14 at ¶ 47.)

80.     D.     Clinicals at Alternate Locations.

81.     Moving Plaintiffs to an alternative Clinical Partner site—months after placements have been made and in the midst of the semester—also is not feasible. (Dkt. 17-1, p. 14 at ¶ 48.)

82.     There are less than nine weeks remaining in the fall 2021 semester, and Clinical Partner placements were made for all students in July of 2021. It would not be feasible to move Plaintiffs to an alternative Clinical Provider location at this late stage in the fall 2021 semester. (Dkt. 17-1, p. 14 at ¶ 48.)

-12-

83.     MCCCD does not presently have any clinical rotation spots available at a Clinical Partner location that does not require COVID-19 vaccination or that will permit religious accommodations. (Dkt. 17-1, p. 14 at ¶ 49.)

84.     MCCCD would have to either secure additional placements at high-demand Clinical Partner sites that do not require vaccinations or grant exemptions and make arrangements with that Clinical Partner for additional staffing oversight and supervision for Plaintiffs, or identify and displace vaccinated students from their current locations and move them to Mayo (or other Clinical Partner sites mandating vaccine without exemption). (Dkt. 17-1, p. 14 at ¶¶ 49–50.)

85.     Or, MCCCD would have to secure additional placements at Clinical Partner sites that do not require vaccinations or grant exemptions, and then make arrangements for additional staffing oversight and supervision for Plaintiffs and other similarly situated nursing students. (Dkt. 17-1, pp. 14-15 at ¶ 50.)

86.     Accordingly, Plaintiff's were informed that MCCCD could not grant their preferred accommodations. (Dkt. 17-1, p. 15 at ¶ 51.)

87.     MCCCD encouraged Plaintiffs to complete their academic requirements and reminded them of the accommodations previously offered. (Dkt. 17-1, p. 15 at ¶ 51.)

88.     MCCCD has not removed either of the Plaintiffs from the MaricopaNursing program. (Dkt. 17-1, p. 15 at ¶ 51.)

89.     Plaintiffs have been advised that they may withdraw from their clinical rotations without penalty, receive an incomplete, and complete their clinical rotations in a subsequent semester. (Dkt. 17-1, p. 15 at ¶ 51.)

90.     MCCCD assured Plaintiffs that, subject to availability, they would be placed with a Clinical Partner that will accommodate their religious beliefs so that they can complete their program requirements and obtain their degrees in spring 2022. (Dkt. 17-1, p. 15 at ¶ 51, p. 90 at ¶ 2, pp. 92-93.)

**IX.    Plaintiffs Filed the Complaint and the Court Denies the TRO.**

91.    Plaintiff filed a Verified Complaint and Motion for Temporary Restraining Order and/or Preliminary Injunction on October 21, 2021. Plaintiffs assert claims for violation of the Free Exercise Clause and the FERA. (Dkt. 1-2.)

92.    On October 21, the Court denied Plaintiffs' request for a Temporary Restraining Order and set a briefing schedule and hearing on the request for a preliminary injunction. (Dkt. 8.)

**CONCLUSIONS OF LAW**

**I.    The Standard of Review.**

93.    "A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008); Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).

94.    The party seeking injunctive relief must demonstrate that: (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest. Winter, 555 U.S. at 20.

95.    Plaintiffs' requested injunction is not just prohibitory but mandatory in nature, as Plaintiffs seek to prevent MCCCD from acting and to compel MCCCD to "adopt a suitable accommodation for Plaintiffs that will allow them to complete their academic programs on time and as scheduled and contracted-for by Plaintiffs." (Dkt. 2 at 1). See Marlyn Nutras., Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 878-79 (9th Cir. 2009).

96.    Mandatory injunctions "go[] well beyond simply maintaining the status quo"; therefore, they are "particularly disfavored," subject to heightened scrutiny, and are denied "unless extreme or very serious damage will result" and the "facts and law clearly favor the moving party." Id. (citations and quotations omitted) (emphasis added); Stanley v. Univ. of S. Cal., 13 F.3d 1313, 1320 (9th Cir. 1994).

-14-

97.     Mandatory injunctions are "not issued in doubtful cases or where the injury complained of is capable of compensation in damages." Marlyn, 571 F.3d at 879. Plaintiffs do not satisfy this very heavy burden.

**II.     The Requested Injunction Would Not Redress Plaintiffs' Alleged Harm.**

98.     The injunctive relief that Plaintiffs request would not redress their alleged harm, and Plaintiffs are not legally entitled to the relief that they seek.

99.     Plaintiffs allege that MCCCD violated their right to freely exercise their Christian religion by adopting a "vaccine mandate" that "places them in an irresolvable conflict between compliance with the mandate and their sincerely held religious beliefs." (Dkt. 1 at 21-24).

100.     But MCCCD has not adopted a policy or rule mandating COVID-19 vaccination as a condition of admission or attendance at any of its colleges. Plaintiffs are not required to be COVID-19 vaccinated to attend or obtain a nursing degree from MCCCD, nor does MCCCD require that Plaintiffs be COVID-19 vaccinated to participate in clinical nursing rotations.

101.     The Court cannot enjoin MCCCD from engaging in conduct that is not occurring.  Accordingly, the Court denies Plaintiffs' Motion to the extent it seeks to enjoin MCCCD from adopting or implementing a "vaccine mandate".

102.     The Court further finds that Plaintiffs' real grievance is with the COVID-19 vaccination requirements adopted by some of MCCCD's non-governmental Clinical Partners for participation in clinical rotations at that Clinical Partner's location.

103.     The Clinical Partners, however, are not parties to this proceeding, and any order issued by the Court would not bind them. Fed. R. Civ. P. 65(d)(2).

104.     Because MCCCD has no ability, contractual or otherwise, to modify policies adopted by its Clinical Partners for clinical rotations at their facilities, an injunction would not redress Plaintiffs' real grievance.  See Vegan Outreach, Inc. v. Chapa, 454 F. App'x

598, 600-01 (9th Cir. 2011) ("We do not find that a preliminary injunction against only one defendant in this case will likely provide redress against all other officials not under the defendant's control and empowered to apply the same harmful restrictions against the plaintiff").

105.    Accordingly, the Court denies Plaintiffs' Motion, including to the extent it seeks to enjoin or alter the policies, rules, or procedures of MCCCD's Clinical Partners

**III.    In All Events, the Court Holds that Plaintiffs Are Not Likely to Succeed on the Merits of Either of their Two Claims.**

106.    Even assuming that the Court could grant relief that would redress the harm Plaintiffs' allege and seek to enjoin, the Court concludes that Plaintiffs have not demonstrated that they are likely to succeed on the merits of either of their claims.

**A.    The Free Exercise Claim.**

107.    Laws or policies that are neutral, of general applicability, and only have an "incidental effect" on a plaintiff's religious beliefs, are reviewed for rational basis, not strict scrutiny. See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 531 (1993); Emp. Div., Dep't of Hum. Res. of Oregon v. Smith, 494 U.S. 872, 878-79 (1990).

108.    108.    The Court concludes that the policy Plaintiffs challenge is neutral, of general applicability, and has only an incidental effect on Plaintiffs relief.

109.    The Court therefore reviews the Free Exercise Claim under the rational basis standard.

110.    Other courts that have considered Free Exercise challenges to COVID-19-related mandates and restrictions similarly have applied the rational basis standard. See Resurrection School v. Hertel, 11 F.4th 437, 456 (6th Cir. 2021); Klaassen v. Trustees of Ind. Univ., 2021 WL 3073926, at *25 (N.D. Ind. July 18, 2021); Cassell v. Snyders, 458 F. Supp. 3d 981, 995 (N.D. Ill. 2020); Denis v. Ige, 2021 WL 1911884, at *8 (D. Haw. May 12, 2021).

111.   Under rational basis, the law or policy "must be upheld if it is rationally related to a legitimate governmental purpose." Parents for Privacy v. Barr, 949 F.3d 1210, 1238-39 (9th Cir. 2020). Plaintiffs must "negate every conceivable basis which might support'" the law or policy. Id. (citations omitted).

112.   The Court finds that the MCCCD policy that Plaintiffs seek to enjoin is not a "vaccine mandate", but instead is a policy that requires nursing students to comply with the vaccine requirements of the Clinical Partners where the students are to perform in-person clinical rotations. The Court concludes that such a policy satisfies the rational basis standard.

113.   MCCCD is a provider of nursing education in Maricopa County that graduates hundreds of skilled nurses each year. Given the importance of in-person clinical opportunities to nursing education, MCCCD has a legitimate interest in insuring that it will be able to place students into in-person clinical rotations with its Clinical Partners. The most efficient (and contractually required) method of furthering that interest—i.e., insuring that such rotation opportunities still exist year after year—is to require MCCCD students to comply with the rules and regulations adopted by the Clinical Partners where the students will perform those rotations.

114.   Even if MCCCD's policy is treated as a "vaccine mandate," however, the policy still satisfies the rational basis standard.

115.   It is universally recognized that the state has a legitimate interest in preserving the health and safety of the public and that mandatory vaccinations further such legitimate interests. "For more than 100 years, the United States Supreme Court has upheld the right of the States to enact and enforce laws requiring citizens to be vaccinated." Whitlow v. California, 203 F. Supp. 3d 1079, 1083 (S.D. Cal. 2016); see Jacobson v. Massachusetts,

197 U.S. 11, 27, 29, 38 (1905).[1]

116.   Nationwide, courts have held that states have a legitimate interest in stemming the spread of COVID-19 by implementing mask or vaccine mandates. See Klaassen, 7 F.4th at 593; Williams v. Brown, 2021 WL 4894264, at *8 (D. Or. Oct. 19, 2021); Harris v. Univ. of Mass., Lowell, 2021 WL 3848012, at *6 (D. Mass. August 27, 2021).

117.   Requiring that students comply with COVID-19 safety policies dictated by MCCCD's Clinical Partners, including COVID-19 vaccination requirements, in order to participate in clinical rotations undoubtedly furthers those legitimate interests. The COVID-19 pandemic remains an exigent threat, particularly to those living and working in Maricopa County.

118.   MCCCD's Clinical Partners are on the front lines, serving (among others) citizens that are immunocompromised, ineligible for vaccination, or at high risk for poor outcomes).

119.   Plaintiffs are among the MCCCD nursing students that would be directly interacting with these patients as part of their clinical rotations. Requiring that the students follow the policies dictated by the Clinical Partners (and the vast majority of those partners require vaccination) directly furthers the interest in preventing the spread of COVID-19.

120.   The Court also rejects Plaintiffs' assertion that MCCCD's refusal to grant Plaintiffs' preferred academic accommodations constitutes a violation of the Free Exercise Clause.

---

[1] *See also Prince v. Massachusetts*, 321 U.S. 158, 166-67, 64 S. Ct. 438, 442, 88 L. Ed. 645 (1944); *Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) (mandatory vaccination does not violate the Free Exercise clause); *Whitlow*, 203 F. Supp. 3d at 1083-1086 (upholding vaccination law and stating "the right to free exercise does not outweigh the State's interest in public health and safety"); *Workman v. Mingo Cty. Bd. of Educ.*, 419 F. App'x. 348, 353-54 (4th Cir. 2011).

121.   Plaintiffs do not have a First Amendment right to a religious exemption from a vaccination requirement, let alone to the religious-based accommodation of their preference.

122.   Federal courts consistently have held that a mandatory vaccination requirement does not violate the Free Exercise Clause—even where there is no religious exemption. See Nikolao v. Lyon, 875 F.3d 310, 316 (6th Cir. 2017); Harris, 2021 WL 3848012, at *7.

123.   Plaintiffs' dissatisfaction with MCCCD's decision to reject their preferred accommodation is not a viable Free Exercise Clause claim.

124.   Accordingly, the Court holds that Plaintiffs have not satisfied their burden to show that the Free Exercise Claim is likely to succeed on the merits.

**B.     The FERA Claim.**

125.   Defendant MCCCD argues that the Court should decline to exercise supplemental jurisdiction over the FERA claim under 28 U.S.C. § 1367(c)(1), because that claim requires evaluation of novel and complex issues of Arizona law.  The Court agrees, and it will decline to exercise supplemental jurisdiction over the FERA claim.

126.   However, even if the Court were to exercise supplemental jurisdiction over the FERA claim, the Court finds that Plaintiffs are not likely to succeed on the merits of this claim.

127.   Under the FERA, Plaintiffs bear the burden of proving that the challenged law or policy substantially burdens their exercise of a sincerely held religious belief. See Brush & Nib Studio, LC v. City of Phoenix, 247 Ariz. 269, 297, ¶ 127 (2019). If that is satisfied, then the burden shifts to the Defendant to demonstrate a compelling state interest and the least restrictive means of furthering that interest. See A.R.S. § 41-1493.01. Plaintiffs have not satisfied and cannot satisfy this standard.

128.   As an initial matter, the Court concludes that Plaintiffs are not likely to prevail

-19-

1   on the merits of this claim because MCCCD did not adopt a policy mandating COVID-19

2   vaccination.

3       129. The Court assumes for purposes of the Motion that Plaintiffs hold a sincerely

4   held religious belief.

5       130. However, the Court concludes that the MCCCD policy that Plaintiffs

6   challenge is not a substantial burden on Plaintiffs' exercise of a sincerely held religious

7   belief. For that reason alone, Plaintiffs are not likely to prevail on the merits of the FERA

8   claim.

9       131. "[A] substantial burden exists only when government action forces

10   individuals to choose between following the precepts of their religion and receiving a

11   government benefit, or it compels them, under threat of criminal sanction, to perform acts

12   undeniably at odds with fundamental tenets of their religious beliefs." Brush & Nib Studio,

13   LC, 247 Ariz. at 298, ¶ 131 ("Not every burden is substantial").

14       132. The vaccination requirements of MCCCD's Clinical Partners do not compel

15   Plaintiffs to perform acts undeniably at odds with their religious beliefs under threat of

16   criminal sanction. Nor do such requirements force Plaintiffs to choose between their

17   religious beliefs and the receipt of a government benefit.

18       133. Plaintiffs' adherence to their religious beliefs will not deprive them of "the

19   remainder of their contracted-for education services". Plaintiffs will not be expelled from

20   MCCCD. They will not receive a failing grade. They will not be financially penalized. They

21   simply will be unable to complete the clinical component of their courses this semester.

22   That is not a substantial burden.

23       134. Accordingly, for this reason alone, Plaintiffs are not likely to prevail on the

24   merits of the FERA claim.

25       135. However, the Court finds that even if Plaintiffs were able to satisfy their

26   burden of demonstrating a substantial burden, MCCCD has met its burden of demonstrating

-20-

1    that the Clinical Partner vaccination requirements are motivated by compelling interests.

2    136.    Those compelling interests include (1) insuring that MCCCD can continue to

3    offer in-person clinical rotations to all of its nursing students; and (2) stemming the spread

4    of COVID-19 and ensuring a safe environment for Clinical Partner patients (especially

5    those most vulnerable to this disease).   See Roman Cath. Diocese of Brooklyn v. Cuomo,

6    141 S. Ct. 63, 67 (2020) ("Stemming the spread of COVID-19 is unquestionably a

7    compelling interest …."); Williams 2021 WL 4894264, at *11.

8    137.    The Court further finds that MCCCD has met its burden of demonstrating that

9    it follows the least restrictive means available.

10    138.    Under this element of the FERA test, MCCCD "must show that it lacks other

11    means of achieving its desired goal without imposing a substantial burden on the exercise

12    of religion by the objecting party." Brush & Nib Studio, 247 Ariz. at 302 (internal citations

13    omitted).

14    139.    MCCCD does not need to show that there are no "conceivable" less restrictive

15    means—only that the proposed alternatives are "ineffective or impractical." Id.

16    140.    MCCCD has satisfied this burden.

17    141.    MCCCD's Clinical Partner vaccination requirements and MCCCD's policy

18    of requiring compliance with those requirements are narrowly tailored. Each MCCCD

19    nursing student need only comply with the vaccination requirements of the Clinical Partner

20    to which the student has been assigned. See Does 1-6 v. Mills, 2021 WL 4860328, at *8

21    (1st Cir. Oct. 19, 2021) (healthcare worker vaccination mandate narrowly tailored because

22    it did not "extend beyond the narrow sphere of healthcare workers…").

23    142.    Although MCCCD cannot control whether Clinical Partners offer exemptions

24    from their vaccination requirements, whenever MCCCD nursing students receive approved

25    exemptions from the assigned Clinical Partners, MCCCD permits them to complete their

26    clinical rotation. Similarly, MCCCD has extended academic accommodations to all

1   students requesting them for religious reasons.

2   143.   Plaintiffs argue that their preferred accommodations are less restrictive means

3   of furthering the compelling interests at issue, but the Court disagrees.

4   144.   The Court finds that the accommodations Plaintiffs' prefer are ineffective and

5   impractical, particularly given the time and expense required for MCCCD to put such

6   accommodations in place, the approximately 30 students MCCCD would need to make

7   those accommodations available to, and the fact that the fall 2021 semester is already near

8   completion.

9   145.   Deferring Plaintiffs' clinical rotations to the spring 2022 semester will not

10  compromise Plaintiffs' religious beliefs, and it will afford MCCCD the opportunity to place

11  Plaintiffs with a Clinical Partner whose restrictions do not offend Plaintiffs' religious

12  beliefs.

13  146.   MCCCD's accommodation is the least restrictive means available under the

14  circumstances. For these reasons, Plaintiffs will not succeed on the merits of the FERA

15  claim.

16  **III.    Plaintiffs Have Not Demonstrated Irreparable Harm.**

17  147.   The Court also finds that Plaintiffs have not demonstrated irreparable harm.

18  148.   Plaintiffs allege that they will suffer irreparable harm absent injunctive relief

19  because "the District's threat of removing them from their academic programs if they do

20  not get vaccinated by November 8, 2021" forces them to follow "their religious beliefs and

21  suffering the depravation of these educational benefits". (Dkt. 2 at 8.) The Court disagrees.

22  149.   MCCCD has not and will not "remov[e Plaintiffs] from their academic

23  programs" if they do not get vaccinated. MCCCD has given Plaintiffs academic

24  accommodations by allowing them to withdraw from the clinical component of the courses

25  without penalty and with tuition reimbursement, receive an incomplete for the course,

26  complete the traditional classroom portion of the course during the fall, and complete the

clinical rotation component of the courses next semester, provided appropriate Clinical Partner sites are available. Plaintiffs will not be divested of their opportunity to complete the clinical rotations, or the opportunity to graduate and apply for a nursing license.

150.    At most, Plaintiffs' completion of the clinical component of the relevant courses may be slightly delayed; however, it is well-established that a delay in collegiate education does not constitute irreparable harm. See Am.'s Frontline Drs. v. Wilcox, 2021 WL 4546923, at *7 (C.D. Cal. July 30, 2021) (delay in education resulting from refusal to comply with vaccine requirement did not constitute irreparable harm); Harris, 2021 WL 3848012, at *8 (same).

**IV.    The Balance of Hardships Weighs in Favor of MCCCD.**

151.    The Court must balance the burden on Plaintiffs (if the status quo is maintained) with the burden on MCCCD (if the injunction is granted). Porretti v. Dzurenda, 11 F.4th 1037, 1050 (9th Cir. 2021).

152.    The Court finds that MCCCD will suffer financial, administrative, and potentially contractual harm (vis-à-vis its Clinical Partners) if injunctive relief is granted. MCCCD will incur significant time and expense in implementing Plaintiffs' proposed accommodations.

153.    The Court finds that Plaintiffs will suffer, at most, a short delay in obtaining their nursing degrees. They will not be required to violate their religious beliefs by getting vaccinated.

154.    Accordingly, the balance of hardships weighs decidedly in favor of MCCCD. See Children's Health Def., Inc. v. Rutgers State Univ. of N.J., 2021 WL 4398743, at *7 (D.N.J. Sept. 27, 2021) (holding Defendants would suffer harm if required to develop new procedures to accommodate religious-based vaccination objections).

**V.    The Public Interest is Not Served by Granting Injunctive Relief.**

155.    The public interest factor "mostly concerns the injunction's 'impact on

nonparties rather than parties.'" Porretti, 11 F.4th at 1050. It weighs against injunctive relief here.

156.    The Court finds that through MaricopaNursing, MCCCD provides a valuable public service—a comprehensive instructional program (with hands-on clinical experiences) that graduates hundreds of skilled nurses each year into a state that already has a critical shortage of nurses.

157.    The Court finds that Plaintiffs' desired injunction would jeopardize the administration of the program, threaten MCCCD's contractual relationships with Clinical Partners, and undermine the ability of all of MCCCD's nursing students to obtain needed in-person clinical placements.

158.    The Court concludes that the public is not served by an injunction that may negatively impact such a broad class of non-parties.

159.    The Court concludes that Plaintiffs have not satisfied the Winter factors and are not eligible for injunctive relief.

160.    For these reasons, the Court denies the Motion.

-24-