**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Emily Thoms, et al., | No. CV-21-01781-PHX-SPL |
| Plaintiffs, | |
| vs. | **ORDER** |
| Maricopa County Community College District, | |
| Defendant. | |

Before the Court is Plaintiffs' Motion for Preliminary Injunction. (Doc. 2). Having reviewed the parties' briefing (Docs. 2, 17, 24) and Proposed Findings of Fact and Conclusions of Law (Docs. 21, 22), and having held an evidentiary hearing on November 1, 2021, the Court enters this order granting Plaintiffs' request for a preliminary injunction as modified.

## I.   BACKGROUND

### a.  Factual Background

Plaintiffs Emily Thoms and Kamaleilani Moreno are nursing students at Mesa Community College, within Defendant Maricopa County Community College District, a political subdivision of the state of Arizona. (Doc. 1 at 3). Plaintiffs are scheduled to receive Associate Degrees in Applied Science in Nursing on December 17, 2021. (Doc. 1 at 19, 21). As part of their coursework, however, Plaintiffs are assigned to complete a three-day clinical rotation beginning November 8 at Mayo Clinic, which requires students to show proof of COVID-19 vaccination and does not allow for religious exemptions—that is, it

requires universal vaccination. (Ex. 100 at Bates 8–9; Doc. 1 at 21). Plaintiffs have sincere religious objections to receiving any COVID-19 vaccination due to the use of fetal cell lines procured from abortions in their testing, development, or production. (Doc. 1 at 3). Defendant does not dispute the sincerity of Plaintiffs' religious objections.

To administer its nursing program, Defendant enters into written agreements with healthcare entities that provide students with hands-on clinical experiences, which are ordinarily required for accreditation by the Arizona State Board of Nursing ("AZBON"). Ariz. Admin. Code § R4-19-206(C); (Ex. 101 at Bates 61). Due to the COVID-19 pandemic, however, from March 2020 through the Spring 2021, most of Defendant's clinical partners stopped hosting in-person clinical rotations. (Ex. 100 at Bates 5–6). As a result, Defendant received a waiver from the AZBON, which has been renewed to run through August 12, 2022, that allows Defendant to use online activities, simulations, and other methods to teach the relevant competencies. (Hearing Tr.[1] at 44:4–11). From March 2020 through Spring 2021, the majority of Defendant's nursing students completed simulations instead of in-person clinicals. (Hearing Tr. at 74:19–21). By Spring 2021, Defendant's clinical partners had largely resumed hosting clinical rotations, so simulations are now standard only for those specialties for which its partners are still not permitting in-person clinicals. (Ex. 100 at Bates 6–7).

For at least fifteen years, Defendant has required nursing students to agree prior to enrollment that they will meet the placement requirements of its most stringent clinical partner, including vaccination requirements. (Ex. 100 at Bates 4). This is because, according to Defendant, it randomly assigns students' clinical placements. (Ex. 100 at Bates 4–5). To the contrary, Plaintiffs allege that students are allowed to pick their top three site preferences, and Defendant assigns clinicals based on those preferences. (Doc. 1 at 6). Indeed, Ms. Moreno listed Mayo Clinic for two of her top three clinical site preferences for the Fall 2021 semester because, at the time she submitted her preferences,

---

[1] Citations to the "Hearing Transcript" refer to the transcript of the November 1, 2021 Preliminary Injunction hearing, reflected at Min. Entry 29.

Mayo was not requiring universal vaccination. (Hearing Tr. at 83:25–84:8).

Beginning in June 2021, Defendant worked on assigning clinical placements for nursing students for the Fall 2021 semester. (Ex. 100 at Bates 4; Hearing Tr. at 27:17–21). Those assignments were finalized by late August. (Ex. 100 at Bates 8). Around that time, several of Defendant's clinical partners advised Defendant that students participating in clinicals at their facilities would be required to provide proof of COVID-19 vaccination. (Ex. 100 at Bates 7). The first clinical partner to do so was Banner Health on July 22, 2021, though it would allow students to apply for a religious exemption. (Ex. 100 at Bates 9). Mayo Clinic informed Defendant of its universal vaccination requirement on September 16, 2021. (Ex. 100 at Bates 9).

Sometime in August 2021, Defendant informed its nursing students that by September 30, 2021, in accordance with its "most stringent clinical partner" policy, they would need to either provide proof of COVID-19 vaccination or alternatively, submit a declination form and request religious and/or medical accommodations. (Ex. 103). Students were warned that even if they submitted an accommodation request to Defendant, Defendant "cannot modify the requirements as outlined by our clinical partners. Academic accommodations such as waivers of the tuition refund or withdrawal policies . . . may be approved." (Ex. 103 at Bates 90).

On September 10, 2021, Plaintiffs submitted their respective declination forms and religious accommodation requests. (Exs. 1, 2). On September 14, 2021, Defendant denied Plaintiffs' "requested religious accommodation[s]" and approved "alternative reasonable accommodation[s]," including the ability to participate in on-campus instruction and activities while unvaccinated, the ability to withdraw from classes with a clinical component along with an exception to the tuition refund policy, and the potential of taking an "Incomplete" grade for such classes until they could possibly be placed in clinicals in Spring or Summer 2022. (Exs. 113, 114). The September 14 letters further stated that religious accommodation decisions are made "on a case-by-case basis taking into account many factors" and that Defendant "cannot change its requirements for program completion,

exempt students from, or remove academic or clinical components that are part of its approved and accredited program of study as this would constitute an undue hardship upon" Defendant. (Ex. 113 at Bates 112; Ex. 114 at Bates 114).

Defendant offered similar accommodations to all 124 students who requested religious accommodation. (Ex. 100 at Bates 10). In addition, by September 16, 2021, Defendant offered an accommodation to students whose assigned clinical sites did not require universal COVID-19 vaccination, extending the deadline to comply with the "most stringent clinical partner" requirement until after they had completed their Fall 2021 clinicals. (Doc. 1 at 7). In effect, this allowed students whose assigned clinical sites either did not require vaccination or offered religious exemptions to meet only *their* clinical site's vaccine requirements rather than those of Defendant's most stringent clinical partner. But for Plaintiffs, whose clinical site requires vaccination and does not offer religious exemptions, this accommodation would not alleviate their inability to complete their clinical rotation.

After their requested accommodations were denied, Plaintiffs proceeded to propose to Defendant various alternatives that they could complete in lieu of in-person clinicals. (Ex. 100 at Bates 11). These alternatives include simulated clinicals, extra assignments, finding new clinical sites, and swapping Plaintiffs' assigned clinical sites with those of vaccinated students whose assigned sites did not require universal vaccination. (Ex. 100 at Bates 11). Defendant rejected all of their proposals as infeasible, unreasonable, or both. (Ex. 100 at Bates 11).

Defendant has, however, offered alternatives to in-person clinicals on several recent occasions for non-religious reasons. Not only did Defendant provide simulated clinicals when in-person clinicals were not available during the COVID-19 pandemic, Ms. Moreno testified at the preliminary injunction hearing that she was sick on one of her clinical days and completed two case studies as a make-up assignment. (Hearing Tr. at 80:4–10). Claire Ballam, another of Defendant's nursing students, testified that her clinical group completed a simulation day instead of an in-person clinical when the group failed to meet the clinical

partner's compliancy requirements on time.[2] (Hearing Tr. at 97:10–17; Ex. 41). And Dr. Margi Schultz, Director of Defendant's Nursing Division, testified that to her knowledge, Defendant has offered an alternative to an in-person clinical for one student since Spring 2021.[3] (Hearing Tr. at 46:10–14).

On October 22, 2021, hours before being served with notice of the instant lawsuit, Defendant made Plaintiffs a final accommodation offer. Defendant stated that it encouraged Plaintiffs to complete the academic components of their courses this fall, and that it would allow Plaintiffs to withdraw from their clinicals without penalty, receiving an "Incomplete" on their transcript. (Ex. 28). Then, so long as it had a clinical partner who was not requiring universal vaccination in the Spring 2022 semester, Defendant would ensure that Plaintiffs were placed at such clinical sites so that they could complete their clinical requirements and graduate. (Ex. 28). By that time, however, Plaintiffs had already filed suit.

### b.  Procedural Background

On October 21, 2021, Plaintiffs filed their Complaint alleging two counts: (1) violation of the Free Exercise Clause of the First Amendment through 42 U.S.C. § 1983; and (2) violation of Arizona's Free Exercise of Religion Act ("FERA"). (Doc. 1). Plaintiffs requested relief including a temporary restraining order and/or a preliminary injunction, followed by a permanent injunction, restraining enforcement of Defendant's alleged "Vaccine Mandate" and requiring accommodations; a declaratory judgment that the alleged "Vaccine Mandate" is unconstitutional on its face and as applied; and costs and

---

[2] In fact, Ms. Ballam was assigned to a five-day clinical rotation at Mayo Clinic and is similarly situated to Plaintiffs in that she is unable to complete the clinical due to her religious objection to receiving a COVID-19 vaccine. But because the first day of her five-day clinical was cancelled and replaced with a simulation day, which she participated in, she has received credit for one of the five days of the clinical rotation. She will be four clinical days short of graduating in December, however, since Defendant will not provide a similar accommodation for her religious beliefs. (Hearing Tr. at 97:18–98:1).

[3] It is unclear whether Dr. Schultz was referring to the same instance as either Ms. Moreno or Ms. Ballam, but regardless, the testimony from Dr. Schultz, one of Defendant's administrators, corroborates the students' testimony that Defendant has offered alternatives to in-person clinicals.

fees. (Doc. 1).

Contemporaneously, Plaintiffs also filed a Motion for Temporary Restraining Order ("TRO") and/or Preliminary Injunction. (Doc. 2). The same day, the Court denied the Motion for a TRO because the threatened harm to Plaintiffs was not so immediate that Defendant could not first be heard on the matter. The Court ordered an expedited briefing schedule on the Motion for a Preliminary Injunction and set a hearing for November 1, 2021. (Doc. 8). At the evidentiary hearing, the Court heard testimony from several witnesses and received dozens of exhibits into evidence, which have aided the Court in deciding the instant Motion. (Min. Entry 29).

### c. The Policy

Plaintiffs have done themselves no favors in this case by framing their lawsuit as a challenge to Defendant's so-called "Vaccine Mandate." In fact, Defendant does not have a vaccine mandate. Rather, Plaintiffs themselves define the alleged "Vaccine Mandate" as Defendant's "administrative regulation . . . which requires all [of Defendant's nursing] students . . . assigned to a Fall 2021 clinical rotation with a clinical partner who requires universal vaccination for clinical placements, to forfeit their sincere religious beliefs and get vaccinated before the start of said rotation" in order to fulfill their clinical requirements and be able to graduate. (Doc. 1 at 1–2); *see also* (Doc. 2 at 2) ("This Motion stems from a COVID-19 vaccine mandate recently imposed by [Defendant] on its [nursing] students as a prerequisite to their performance of Fall 2021 clinicals and the completion of their academic programs (the "Vaccine Mandate")."); (Hearing Tr. at 12:16–13:4). Though lengthy, these descriptions properly capture the nuanced facts of this case. Based on Plaintiffs' descriptions of the purported "Vaccine Mandate," the Court construes their lawsuit as a challenge to Defendant's requirements that students must satisfy the vaccination policies of their assigned clinical partners and must complete their assigned in-person clinicals in order to complete their academic programs. The Court refers to these requirements as the "Policy."

///

## II.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). An injunction may be granted only where the movant shows that (1) she is likely to succeed on the merits; (2) she is likely to suffer irreparable harm absent such relief; (3) the balance of equities tips in her favor; and (4) an injunction is in the public interest. *Id.* at 20. The Ninth Circuit observes a "sliding scale" approach that balances these elements "so that a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Thus, an injunction can issue where there are "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.  Still, "[l]ikelihood of success on the merits is the most important *Winter* factor; if a movant fails to meet this threshold inquiry, the court need not consider the other factors in the absence of serious questions going to the merits." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal citations and quotation marks omitted).

Further, Plaintiffs in this case seek a particularly extraordinary form of relief, requesting an injunction that is mandatory in part. Unlike a prohibitory injunction, a mandatory injunction goes "beyond the status quo pending litigation" and "orders a responsible party to take action." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal quotation marks omitted). "In general, mandatory injunctions are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages." *Id.* (internal quotation marks omitted). Here, Plaintiffs ask the Court not only to prohibit enforcement of Defendant's Policy but also to mandate that Defendant provide accommodations that would allow Plaintiffs to complete their academic programs on time. (Doc. 22-1 at 13–14). And because the prohibitory portion of the

requested injunction alone would not prevent Plaintiffs' alleged harm—that is, absent mandatory relief, Plaintiffs' only option to fulfill the clinical component of their coursework would still be to complete their clinical rotation at Mayo Clinic, which would still have an enforceable universal vaccination requirement—the Court will grant Plaintiffs' Motion only if they meet the heightened standard for a mandatory injunction.

## III.   SUBJECT MATTER JURISDICTION

The Court plainly has federal question jurisdiction under 28 U.S.C. § 1331 over Plaintiffs' First Amendment claim made through 42 U.S.C. § 1983. But Defendant argues that the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state-law claim. Defendant suggests that "the claim raises a novel or complex issue of State law," which, under 28 U.S.C. § 1367(c)(1), is grounds for the Court to decline to exercise supplemental jurisdiction. (Doc. 17 at 14).

The Court finds that there is sufficient Arizona case law interpreting FERA for the Court to evaluate Plaintiffs' likelihood of success on the merits of that claim without intruding on state sovereignty. This is particularly true given the Arizona Supreme Court's statement that because the federal Religious Freedom Restoration Act ("RFRA") "is substantially identical to FERA, the United States Supreme Court's interpretation of RFRA, although technically not binding in our interpretation of FERA, provides persuasive authority." *State v. Hardesty*, 214 P.3d 1004, 1008 n.7 (Ariz. 2009) (internal citations omitted). The Arizona Supreme Court later stated that, "[l]ike RFRA, FERA created a rule based on the [United States] Supreme Court's pre-[*Employment Division v. Smith*, 494 U.S. 872 (1990)] framework." *Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890, 918 (Ariz. 2019); *see also* Free Exercise of Religion Act, ch. 332, § 2, 1999 Ariz. Sess. Laws 1770 ("The compelling interest test, as set forth in the federal cases of *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and *Sherbert v. Verner*, 374 U.S. 398 (1963), is a workable test for striking sensible balances between religious liberty and competing government interests."). When interpreting FERA, then, the Arizona Supreme Court has relied extensively on federal Free Exercise cases that pre-date *Smith* and on federal RFRA cases, to which this

Court may also refer.[4] *See, e.g.*, *Hardesty*, 214 P.3d at 1007–09; *Brush & Nib Studio, LC*, 448 P.3d at 919–25. Thus, because the Arizona courts have provided sufficient guidance on the interpretation and application of FERA, this Court will exercise supplemental jurisdiction over Plaintiffs' state-law claim.

## IV.   *WINTER* ANALYSIS

The Court will analyze the *Winter* elements for granting a preliminary injunction in turn. Ultimately, the Court concludes that Plaintiffs have shown each element and have met the heightened standard for a mandatory injunction.

### a.  Likelihood of Success on the Merits

The Court will first evaluate the likelihood of Plaintiffs' success on their state-law FERA claim and then proceed to their First Amendment claim. The Court finds that Plaintiffs are likely to succeed on the merits of both claims.

#### i.  FERA Claim

FERA states that "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person is both: (1) [i]n furtherance of a compelling governmental interest[; and] (2) [t]he least restrictive means of furthering that compelling governmental interest." A.R.S. § 41-1493.01(C). The Arizona Supreme Court has set forth a burden-shifting framework for deciding FERA claims. To prevail on a FERA claim, a plaintiff must first establish three elements: "(1) that an action or refusal to act is motivated by a religious belief, (2) that the religious belief is sincerely held, and (3) that the governmental action substantially burdens the exercise of religious beliefs." *Hardesty,* 214 P.3d at 1007. The burden then shifts to the government "to demonstrate that its action furthers a 'compelling governmental interest' and is 'the least restrictive means of furthering that compelling governmental interest.'" *Id.* (quoting A.R.S. § 41-1493.01(C)).

---

[4] The Court notes that many of the federal cases it cites when evaluating the FERA claim have been abrogated or overruled as federal Free Exercise doctrine has evolved. But because FERA invokes the *Yoder* and *Sherbert* test, cases using that test still provide helpful guidance for the state-law claim, even if they are no longer good federal law.

Here, the first two elements of Plaintiffs' burden are not disputed: Plaintiffs' refusal to receive a COVID-19 vaccine is motivated by their religious beliefs, and their religious beliefs are sincerely held. Defendant does, however, dispute that its Policy constitutes a "substantial burden" on Plaintiffs' exercise of their religious beliefs.

FERA specifies that in the context of the statute, the term "substantially burden" is used "solely to ensure that this article is not triggered by trivial, technical, or de minimis infractions." A.R.S. § 41-1493.01(E). Quoting pre-*Smith* federal Free Exercise cases, the Arizona Supreme Court has said that under FERA, "a substantial burden exists only when government action 'forces' individuals 'to choose between following the precepts of their religion' and receiving a government benefit, or it 'compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs.'" *Brush & Nib Studio, LC*, 448 P.3d at 919 (first quoting *Sherbert*, 374 U.S. at 404; then quoting *Yoder*, 406 U.S. at 218). The United States Supreme Court had previously explained the first prong, stating:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial.

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717–18 (1981).

Here, Plaintiffs argue that Defendant's Policy is a substantial burden because it forces them to choose between abiding by their religious beliefs on the one hand, and receiving their nursing degrees in December 2021 on the other. (Doc. 24 at 4–6). To the contrary, Defendant argues that a mere delay in Plaintiffs' ability to complete their clinical coursework does not amount to a substantial burden. Defendant emphasizes that Plaintiffs will not have to forgo their religious beliefs and receive a vaccine in order to graduate; they will merely have an "Incomplete" for their coursework until Defendant is able to assign them to a clinical partner that does not require universal vaccination. (Doc. 17 at 15).

Notably, however, Defendant cannot guarantee that it will be able to assign Plaintiffs to such a clinical partner, much less when it will be able to do so. Defendant has "assured" Plaintiffs that it will place Plaintiffs with clinical partners that will accommodate their religious beliefs in Spring 2022, but that assurance is subject to the availability of a clinical partner that does not require universal vaccination. (Doc. 17 at 9–10). And even if Defendant is initially able to assign Plaintiffs to clinical partners that would not require them to receive a vaccine, Defendant acknowledges that its clinical partners' vaccine policies are "constantly changing." (Doc. 17 at 6). In fact, Ms. Moreno testified that at the beginning of the semester, she had listed Mayo Clinic as one of her preferred clinical sites *because* Mayo did not require vaccination, only for the hospital to implement such a requirement prior to her clinical. (Hearing Tr. at 84:2–8). It is difficult to characterize these circumstances as a mere delay when there is no clear end date when Plaintiffs will be able to graduate.

Further, Defendant improperly generalizes the government benefit that Plaintiffs seek. Plaintiffs ask not merely to receive the nursing degrees at some indeterminate time in the future, but to receive their nursing degrees *on December 17, 2021* as they anticipated. Indeed, Defendant does not dispute that Plaintiffs would be entitled to receive their nursing degrees on that date if they complete their clinical requirements. And the sole reason why they cannot complete their clinical requirements is that Defendant will not allow them to do so without receiving a COVID-19 vaccination, based on their assigned clinical partner's policies. To be sure, the chain that connects Defendant's Policy and the burden on Plaintiffs' religious beliefs is somewhat attenuated.  But a burden need not be directly imposed in order to be substantial. *See Thomas*, 450 U.S. at 718.

The burden imposed here by denying Plaintiffs their nursing degrees on December 17, 2021 cannot be characterized as "trivial, technical, or de minimis." A.R.S. § 41-1493.01(E). By denying Plaintiffs their nursing degrees, Defendant prevents them from becoming licensed and employed as nurses. They will be unable to join the profession to which they have devoted themselves for the past two years. Given the time and money that

Plaintiffs have invested in their nursing education, Defendant's Policy undoubtedly places substantial pressure on them to modify their behavior in violation of their beliefs. Plaintiffs are faced with the choice of, on the one hand, compromising their religious beliefs to complete their clinicals and graduate as expected on December 17, 2021, or on the other, adhering to their beliefs and giving up the nursing degrees to which they are otherwise entitled and all their associated benefits for the indefinite future. (Doc. 1 at 19, 21; Hearing Tr. at 80:22–81:18). This is exactly the sort of choice that FERA was enacted to prevent. *See Sherbert*, 374 U.S. at 404 (finding a substantial burden existed where plaintiff was "force[d] to choose between following the precepts of her religion and forfeiting [unemployment] benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand"); *cf. Peace v. Peace*, No. 1 CA-CV 13-0150, 2014 WL 1884868, at *3 (Ariz. Ct. App. May 8, 2014). Plaintiffs have thus shown a strong likelihood that they can carry their burden on their FERA claim.

Under FERA, the burden then shifts to Defendant to demonstrate that its Policy is justified by a compelling interest and that the Policy is the least restrictive means of accomplishing that interest. Defendant asserts two interests in this case: "(1) [e]nsuring that [Defendant] can continue to offer in-person clinical rotations to all of its nursing students; and (2) stemming the spread of COVID-19 and ensuring a safe environment for Clinical Partner patients." (Doc. 17 at 15–16). Plaintiffs do not dispute that these are compelling interests, as they undoubtedly are. *Hunter ex rel. Brandt v. Regents of Univ. of Cal.*, 190 F.3d 1061, 1067 (9th Cir. 1999) (finding "a compelling interest in providing effective education"); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) ("Stemming the spread of COVID-19 is unquestionably a compelling interest . . . ."). Instead, Plaintiffs argue that Defendant's policy is not justified by the second interest and that it is not the least restrictive means of achieving the first. The Court agrees.

As to the Defendant's asserted interest in stemming the spread of COVID-19 and ensuring a safe environment for patients, Defendant's claim is belied by its own argument

that it is simply requiring students to abide by the policies of their assigned clinical partners. In fact, Defendant loosened its "most stringent clinical partner" policy—a policy that has been in place for at least fifteen years, well before COVID-19 even existed—by exempting students with religious objections to receiving a COVID-19 vaccine who were assigned to clinical sites without universal vaccination requirements. (Ex. 100 at Bates 4, 9). By doing so, Defendant created a greater risk that those students would spread COVID-19 to their clinical patients and the public than it would have if it had continued to strictly enforce its pre-pandemic policy. To be sure, the exemptions were provided to accommodate students with religious objections to vaccination. (Ex. 100 at Bates 9). But Defendant cannot justify a policy that burdens Plaintiffs' religious beliefs by asserting an interest in stemming the spread of COVID-19 and protecting patients, while at the same time providing accommodations to similarly situated students that undermine the very same interest.

As to Defendant's interest in being able to provide clinical rotations to future nursing students, Defendant argues that it would violate its contractual obligations to and jeopardize its relationships with its clinical partners if it did not require its students to abide by its partners' policies. Plaintiffs counter that Defendant can still achieve this goal while offering any of the following five alternatives that would allow Plaintiffs to complete their academic programs without burdening their religious beliefs: (1) providing simulated clinical experiences; (2) providing hybrid simulated and in-person clinical experiences at sites without universal vaccination requirements; (3) providing extra assignments or online simulations; (4) switching clinical partner assignments; or (5) asking clinical partners to modify their vaccine policies to permit religious exemptions. (Doc. 1 at 9–10).

"Under the least restrictive means test, the government must show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Brush & Nib Studio, LC*, 448 P.3d at 923 (internal quotation marks omitted). The government need not show that there are no "conceivable" less restrictive means, "but only that the proposed alternatives are ineffective or impractical." *Id.* (internal quotation marks omitted). "This is a focused inquiry, requiring

the government to establish that applying the law in the *particular circumstances* is the least restrictive means." *Id.* (internal quotation marks omitted). This standard amounts to "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997).

Under the circumstances presented in this case, Defendant likely has feasible and less restrictive means of ensuring that it can continue to provide nursing students with clinical opportunities without substantially burdening Plaintiffs' religious exercise. As to Plaintiffs' first and third proposed alternatives, Defendant argues that simulations or extra assignments are "financially and logistically unviable" and "would lower or substantially modify essential requirements of the nursing program." (Doc. 17 at 8). It is true that "cost may be an important factor in the least-restrictive-means analysis." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 730 (2014). But in some circumstances, FERA may require government entities like Defendant "to expend additional funds to accommodate citizens' religious beliefs." *Id.* Such circumstances exist here.

The potential financial and logistical burdens of implementing an academic alternative to Plaintiffs' clinical rotations are not so great that they outweigh the substantial burden Defendant's Policy likely places on Plaintiffs' religious exercise. *See Grosz v. City of Mia. Beach*, 721 F.2d 729, 734 (11th Cir. 1983), *cert. denied* 469 U.S. 827 (1984). In fact, at the preliminary injunction hearing, Plaintiffs presented several pieces of evidence that Defendant has already provided academic alternatives to in-person clinicals during the Fall 2021 semester. Dr. Schultz testified that she knew of one student who had been allowed to make up in-person clinical time in a different form (Hearing Tr. at 46:10–14); Ms. Moreno testified that she completed case studies as a make-up assignment for a clinical she could not attend due to illness (Hearing Tr. at 80:4–10); and Ms. Ballam testified that when the first day of one of her clinical group's rotations was cancelled, her professor scheduled a simulation day instead (Hearing Tr. at 97:10–17). Regardless of whether such accommodations were made in accordance with Defendant's formal policies, they show that academic alternatives to in-person clinicals are feasible.

14

The Court is similarly unpersuaded by Defendant's argument that simulations or extra assignments are not an option because they would lower the requirements of the nursing program. The Court appreciates that clinical rotations provide students with unique hand-on educational experiences, allowing them to practice nursing skills with real-life patients. (Hearing Tr. at 59:7–14). But from March 2020 to the spring of 2021, Defendant substituted simulated clinicals for the majority of its students' clinical rotation requirements. To be sure, this was out of necessity, as Defendant's clinical partners were not hosting student clinicals in light of the COVID-19 pandemic. (Ex. 100 at Bates 5–6). But Defendant still has an operative waiver from the AZBON allowing simulated clinicals or other accommodations. (Ex. 21). And considering Defendant considered simulated clinicals a sufficient academic alternative to in-person clinicals for graduating students a year ago, the Court is not convinced that they should now be considered ineffective or impractical as a religious accommodation under the stringent "least restrictive alternative" standard.

Likewise, Plaintiffs' fourth proposed accommodation—swapping Plaintiffs' assigned clinical sites with those of vaccinated students whose assigned sites do not require universal COVID-19 vaccination—is likely another feasible and less restrictive alternative that would have no impact on Defendant's ability to continue providing clinical opportunities to future students. Defendant argues that it would not be able to displace vaccinated students "months after placements have been made and in the midst of the semester." (Doc. 17 at 9; Hearing Tr. at 65:6–19). But the issue before the Court is whether Plaintiffs are likely to succeed on their claim that Defendant violated FERA when it denied Plaintiffs' request for a religious exemption from the Policy, which occurred no later than September 15, 2021. (Exs. 10, 11). For this purpose, then, the question is not whether less restrictive alternatives are available *now* or even when Plaintiffs filed suit, but rather whether less restrictive alternatives were available on September 15, 2021. On that date, Plaintiffs' clinicals at Mayo were still nearly two months away, yet Defendant made no effort to identify vaccinated students who might have been willing to trade clinical

assignments with Plaintiffs. (Ex. 100 at Bates 11). Defendant has provided no reason why it could not have done so at little or no financial and logistical cost. (Hearing Tr. at 30:14–31:23).

Though the Court does not believe that Plaintiffs' other proposed alternatives could feasibly have been accomplished without undermining Defendant's compelling interest in continuing to provide clinical experiences to its nursing students, Plaintiffs have presented at least three less restrictive alternatives that Defendant could likely have implemented in lieu of the Policy. In addition, Plaintiffs have shown that the Policy likely places a substantial burden upon the exercise of their sincerely held religious beliefs. Thus, Plaintiffs have shown a likelihood of success on their FERA claim.

### ii. First Amendment Claim

The Free Exercise Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, provides that the government "shall make no law . . . prohibiting the free exercise" of religion. To establish a free exercise claim, a plaintiff must first show that the government has substantially burdened her practice of her religion. *See Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015). The Court has already established that Plaintiffs have shown a likelihood that Defendant's policy substantially burdens their religious exercise. Unlike under FERA, however, under the First Amendment, when the burden on free exercise is "merely the incidental effect of a generally applicable and otherwise valid" government policy rather than the object of that policy, the policy is subject only to rational basis review. *Smith*, 494 U.S. at 878; *see Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075–76 (9th Cir. 2015). But if a law is not neutral or not generally applicable, "it is invalid unless it is justified by a compelling interest and is narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). In other words, such a policy is subject to strict scrutiny. *Stormans, Inc.*, 794 F.3d at 1076.

Whether Plaintiffs are likely to succeed on the merits of their First Amendment claim, then, turns largely on whether Defendant's policy is considered neutral and

16

generally applicable.[5] A policy is not neutral if it is "intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021). A policy is not generally applicable "if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Id.* (internal quotation marks omitted). "[W]here the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason." *Id.* (internal quotation marks omitted). Additionally, a policy lacks general applicability "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Id.*

In this case, Defendant's Policy likely lacks general applicability. Plaintiffs presented evidence, through Dr. Schultz's testimony, that Defendant has made at least one exception to its requirement that students complete their assigned in-person clinicals in order to complete their academic programs. (Hearing Tr. at 46:10–14). Ms. Moreno also testified that she when she missed an in-person clinical day due to illness, she was able to make it up by completing case studies. (Hearing Tr. at 80:4–10). And finally, Ms. Ballam testified that her entire clinical group completed a simulated clinical in place of an in-person clinical when they failed to meet the clinical partner's compliancy requirements on time. (Hearing Tr. at 97:10–17). These exceptions do not further Defendant's interests in the Policy, and instead undermine them in a similar manner as a religious exception would. *Cf. Does 1-6 v. Mills*, No. 21-1826, --- F.4th ---, 2021 WL 4860328, at *6 (1st Cir. Oct. 19, 2021) (affirming rational basis review of a vaccine requirement for healthcare workers when a medical exemption reinforced the government's public-health interest in a way that

---

[5] Plaintiffs argue that Defendant's policy is not subject to rational basis review because its burden on their free exercise rights is substantial rather than incidental. But this argument misunderstands the meaning of "incidental" in the free exercise context. A burden is "incidental" not if it has a minimal effect on a person's rights, but rather if it is not the object of the policy to impose such a burden. *See Smith*, 494 U.S. at 878. While Plaintiffs argue that the Policy violates the Free Exercise Clause on its face, that claim is unlikely to succeed as the Policy does not regulate religious beliefs or exercise as such. *See id.* at 877.

a religious exemption would not). Further, they show that Defendant is able to make accommodations to its Policy of requiring in-person clinicals for secular reasons but has not done so for Plaintiffs' religious reasons. Thus, *Fulton* requires that Defendant offer a compelling reason why it cannot extend a similar exception to cases of religious hardship— that is, the Policy must be subjected to strict scrutiny.

Moreover, Defendant's process for reviewing religious accommodation requests appears to be the type of individualized mechanism that triggers strict scrutiny under *Fulton*. The Supreme Court held in *Fulton* that the mere creation of a formal mechanism for granting exceptions makes a policy not generally applicable "because it invites the government to decide which reasons for not complying with the policy are worthy of solicitude." *Fulton*, 141 S. Ct. at 1879 (internal quotation marks omitted). Here, Defendant denied Plaintiffs' requested accommodations because "[r]eligious accommodations are made on a case-by-case basis taking into account many factors, including the impact such an accommodation will have on the educational environment as a whole." (Ex. 113 at Bates 112; Ex. 114 at Bates 114). It is true that Defendant granted some form of religious accommodation to all students who requested one, but that is unimportant under *Fulton*. It is the mere creation of an individualized exemption process that triggers strict scrutiny. *Fulton*, 141 S. Ct. at 1879.

To survive strict scrutiny, the government must show that its actions are justified by a compelling government interest and are narrowly tailored to that interest. *Lukumi*, 508 U.S. at 531–32. In this analysis, the court "must scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Fulton*, 141 S. Ct. at 1881 (internal quotation marks omitted). In other words, to survive strict scrutiny, Defendant must show that it has a compelling interest not in the policy generally, but in denying Plaintiffs an exception to it. *See id*.

To the extent this standard differs from the government's burden under FERA,[6]

---

[6] The United States Supreme Court has routinely referred to the "narrowly tailored" standard in First Amendment Free Exercise cases while referring to the "least restrictive

Defendant's Policy likely fails under First Amendment strict scrutiny, as well. Regarding Defendant's asserted interest in stemming the spread of COVID-19, as explained above, that interest cannot justify the Policy when Defendant loosened its Policy during the pandemic in a way that permitted more students to remain unvaccinated, making them more likely to spread the virus. And Plaintiffs are equally as likely to spread COVID-19 as those students whose clinical sites do not require vaccination, who are nonetheless excluded from the Policy. A policy that is so clearly underinclusive to serving the government's asserted interest cannot withstand strict scrutiny. *See Lukumi*, 508 U.S. at 546–47.

Rather, it is clear to the Court that Defendant's true interest in the Policy is in maintaining its relationships with its clinical partners and being able to provide in-person clinical opportunities to future students, which is certainly compelling. But the Policy is not narrowly tailored to that end. There is no evidence that allowing Plaintiffs to complete an academic alternative to an in-person clinical will have any effect at all on Defendant's clinical partners. In other words, it is unlikely that Defendant has a compelling interest in denying Plaintiffs an exception to the Policy, particularly when it has provided exceptions to other students for non-religious reasons. *See id.* at 546.

To the extent Defendant claims a pedagogical interest in denying Plaintiffs an exemption from the Policy, it is still unlikely to satisfy strict scrutiny. From March 2020 to Spring 2021, Defendant considered simulated clinicals an adequate educational substitute for in-person clinicals and continued to graduate nursing students on that basis. Moreover,

---

means" standard in RFRA cases, implying they are different. *See, e.g.*, *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2260 (2020); *Hobby Lobby Stores, Inc.*, 573 U.S. at 728; *see also St. Mark Roman Cath. Par. Phx. v. City of Phoenix*, No. CV 09-1830-PHX-SRB, 2010 WL 11519169, at *10 (D. Ariz. Mar. 3, 2010) ("While the regulating body need not employ the least restrictive means possible to survive a Free Exercise Clause challenge, the City still must show that the Noise Ordinance is narrowly tailored to achieve a compelling state interest."). *But see Fulton*, 141 S. Ct. at 1881 (stating that under First Amendment strict scrutiny, "so long as the government can achieve its interests in a manner that does not burden religion, it must do so"); *Does 1-3 v. Mills*, --- S. Ct. ---, 2021 WL 5027177, at *1 (Oct. 29, 2021) (Gorsuch, J., dissenting from the denial of application for injunctive relief) ("To [satisfy First Amendment strict scrutiny], the State must prove its law serves a compelling interest and employs the least restrictive means available for doing so.")

Defendant has allowed students to complete substitute assignments in place of in-person clinical days this semester. There is no evidence that allowing religious exemptions to the Policy for Plaintiffs would do any more harm to Defendant's pedagogical interest than the other exceptions it has made. *See id.* And if an accommodation is good enough for students with secular hardships such as illness or other issues, then the Constitution dictates, under these circumstances, that it is good enough for students with religious hardships. *See Fulton*, 141 S. Ct. at 1882.

Defendant points out that in other free exercise cases involving COVID-19-related mandates and restrictions, courts have applied rational basis review and upheld the policies. (Doc. 17 at 12 n.5). To be sure, courts around the country have found that various methods of combatting the COVID-19 pandemic may be constitutional even when they place an incidental burden on religious exercise. *See, e.g.*, *Does 1-6*, 2021 WL 4860328 (affirming denial of injunction for healthcare worker vaccine policy); *We the Patriots USA, Inc. v. Hochul*, --- F.4th ---, 2021 WL 5121983 (2nd Cir. Nov. 4, 2021) (same); *Resurrection Sch. v. Hertel*, 11 F.4th 437 (6th Cir. 2021) (affirming denial of injunction for a school mask policy); *Klaassen v. Trs. of Ind. Univ.*, --- F. Supp. 3d ---, 2021 WL 3073926 (N.D. Ind. July 8, 2021) (denying injunction for university vaccine policy); *Denis v. Ige*, --- F. Supp. 3d ---, 2021 WL 1911884 (D. Haw. May 12, 2021) (dismissing claims challenging state mask mandate); *see also Jacobson v. Massachusetts*, 197 U.S. 11 (1905) (finding compulsory vaccination law constitutional); *Crowley v. Christensen*, 137 U.S. 86, 89 (1890) ("[T]he possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community."). But the facts in those cases are not the facts in this case. The facts in this case make it clear that the Policy is not motivated by the government's compelling interest in stemming the spread of COVID-19. The facts in this case show a likelihood that Defendant has other ways of achieving its goals that would not substantially burden Plaintiffs' religious beliefs. And ultimately, the facts in this case involve not a governmental vaccine mandate, but a set of educational and

administrative policies that, as applied to Plaintiffs, likely violate their First Amendment right to free religious exercise.

### b. Irreparable Harm

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. Irreparable harm is harm "that cannot be redressed by a legal or equitable remedy following trial." *Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, 475 F. Supp. 2d 995, 1007 (C.D. Cal. 2007) (internal quotation marks omitted). Plaintiffs allege that absent an injunction, their right to freely exercise their religious beliefs will be violated, which amounts to irreparable harm. Indeed, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) ("[C]onstitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."). And under FERA, "[f]ree exercise of religion is a fundamental right" in Arizona. A.R.S. § 41-1493.01(A).  If the loss of a federal constitutional right amounts to irreparable injury, so too must the loss of a fundamental right under state law. Because Plaintiffs have shown a likelihood on the merits that their First Amendment right to free exercise and their right to free exercise under FERA will be violated absent an injunction, it follows that they have shown a likelihood of irreparable harm.

Defendant argues that a mere delay in Plaintiffs' ability to graduate does not amount to irreparable harm. They are correct that a delay of a plaintiff's higher education alone does not satisfy this factor. *See Am.'s Frontline Drs. v. Wilcox*, No. EDCV 21-1243 JGB (KKx), 2021 WL 4546923, at *7 (C.D. Cal. July 30, 2021) ("It is well established that a delay in collegiate or graduate education isn't typically irreparable harm." (internal quotation marks omitted)). But in the cases Defendant cites, the respective courts found that the plaintiffs had not shown a likelihood of success on the merits of their constitutional claims, meaning the plaintiffs had not shown a likelihood that their rights would be

violated. *Id.* at *8; *Harris v. Univ. of Mass., Lowell*, No. 21-cv-11244-DJC, 2021 WL 3848012, at *5–7 (D. Mass. Aug. 27, 2021). In contrast, here, Plaintiffs have shown a likelihood of success on the merits, so they have shown a likelihood that their right to free religious exercise will be violated. Thus, Plaintiffs' asserted harm is not merely the delay in their education, but the likely violation of their constitutional and fundamental rights, which is without question an irreparable harm.

### c. Balance of Equities and the Public Interest

Under Ninth Circuit law, when the government is a party, the balance of equities and the public interest are considered together in the preliminary injunction analysis. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018). Plaintiffs argue that these factors fall in their favor because of the fundamental nature of the right to free exercise under the Constitution and the law. (Doc. 2 at 11). Indeed, "[p]rotecting religious liberty and conscience is obviously in the public interest" as free exercise "is undoubtedly, fundamentally important." *Id.* at 582. Thus, "[c]ourts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles." *Sammartano v. First Jud. Dist. Ct.*, 303 F.3d 959, 974 (9th Cir. 2002), *abrogated on other grounds by Winter*, 555 U.S. 7; *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) ("It is always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation marks omitted)). In addition to the public interest, the likely violation of Plaintiffs' constitutional rights is obviously a significant hardship on them personally. Because Plaintiffs have shown such a likelihood, this argument weighs strongly in Plaintiffs' favor.

But "balancing the equities is not an exact science," and the protection of religious liberty is not necessarily conclusive. *Azar*, 911 F.3d at 582. Defendant argues that it would suffer "financial, administrative, and potentially contractual harm" if an injunction is issued. (Doc. 17 at 18). Unlike when analyzing the merits of Plaintiffs' claims, on this issue, the Court must consider the hardship that implementing accommodations would impose at the present time. The Court is sympathetic to the potential financial and logistical

burden that an injunction might place on Defendant. Depending on how Defendant chooses to accommodate Plaintiffs, it may need to add to its employees' workload, hire additional staff, rearrange schedules, and take on other costs, all within the next seven weeks. (Ex. 100 at Bates 11–14). But these costs are not so great as to outweigh the protection of a fundamental right, particularly when Defendant has provided academic alternatives to in-person clinicals on at least two other occasions this semester. *See Aytch v. Cox*, No. 2:14-cv-00139-GMN-CWH, 2015 WL 2450498, at *5 (D. Nev. May 21, 2015) ("[T]he [financial] costs of fulfilling [a constitutional] duty cannot outweigh the irreparable harm that is sure to face Plaintiff if he is not awarded preliminary relief.")

Defendant further argues that an injunction would jeopardize the administration of its nursing program, which graduates hundreds of skilled nurses annually, and undermine its ability to provide students with necessary clinical placements. (Doc. 17 at 18). As explained above, however, Defendant has available means to accommodate Plaintiffs' religious beliefs without affecting its ability to properly educate them or to provide clinical placements for future students. And with such an alternative in place, Plaintiffs will be able to graduate in December and enter the nursing profession at a time when, as Defendant acknowledges, there is "a critical shortage of nurses" in Arizona. (Doc. 17 at 18). A preliminary injunction in this case will thus serve the public interest not only by protecting religious liberty but also by ensuring that qualified nurses are able to enter the workforce and provide much-needed care. The balance of equities, then, tips decidedly in Plaintiffs' favor.

In sum, Plaintiffs have shown a likelihood of success on the merits of both of their claims, that they are likely to suffer irreparable harm absent an injunction, and that the balance of equities and the public interest weigh in their favor. Their case is not doubtful, and the harm they have alleged—the violation of their constitutional and fundamental right to free exercise—is an injury of the highest order under the Constitution and the law. Such an injury cannot be remedied by damages. Accordingly, Plaintiffs have shown that they are entitled to mandatory injunctive relief.

23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.     RULE 65(C) BOND

Under Federal Rule of Civil Procedure 65(c), the Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." But the Court has discretion to waive the bond requirement. *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999). Plaintiffs request that the Court do so in this case, and Defendant offers no argument otherwise. Indeed, Plaintiffs have shown a likelihood of success on the merits, and requiring a bond would negatively impact the protection of Plaintiffs' constitutional rights. *See Baca v. Moreno Valley Unified Sch. Dist.*, 936 F. Supp. 719, 738 (C.D. Cal 1996). Moreover, it is not clear to the Court that Defendant will incur significant costs in complying with this Order given that it has already offered alternatives to in-person clinicals to other students. *See id.* at 738; *Ticketmaster L.L.C. v. RMG Techs., Inc.*, 507 F. Supp. 2d 1096, 1116 (C.D. Cal. 2007). The Court will thus waive the security requirement.

## VI.     CONCLUSION

Plaintiffs ask the Court to preliminarily enjoin Defendant's "Vaccine Mandate," but that label ignores the nuances of Defendant's policies that Plaintiffs themselves recognize. The only vaccine mandates in this case belong to Defendant's clinical partners, who are not parties before the Court. Rather, Defendant's Policy is a set of requirements that together, when applied to Plaintiffs, are likely to substantially burden Plaintiffs' right to freely exercise their sincere religious beliefs in violation of FERA and the First Amendment, to cause Plaintiffs irreparable harm, and to go against the public interest. Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 2) is **granted as modified.**

**IT IS FURTHER ORDERED** that the Court enters a preliminary injunction, effective immediately, as follows:

1. Defendant is preliminarily enjoined from enforcing against Plaintiffs its

24

requirements that nursing students satisfy the vaccination policies of their assigned clinical partners and that nursing students must complete their assigned in-person clinical rotations in order to complete their academic programs; and

2. Defendant shall make available to Plaintiffs a suitable accommodation that will allow Plaintiffs to satisfy the clinical components of their coursework and complete their academic programs as scheduled in December 2021.

**IT IS FURTHER ORDERED** that the Court exercises its discretion and waives the requirement of a security bond accompanying this preliminary injunction.

Dated this 5th day of November, 2021.

Honorable Steven P. Logan
United States District Judge

25